OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Terrence Freeman, appeals the decision of the Jefferson County Court of Common Pleas that found him guilty of one count of trafficking in cocaine, a third degree felony under R.C. 2925.03(A)(1) and (C)(4)(6), and one count of possession of cocaine, a third degree felony under R.C. 2925.11(A)(1) and (C)(4)(c).
 {¶ 2} On appeal, Freeman argues that the trial court abused its discretion when it refused to allow him to use a tape of a phone conversation between him and a witness for the prosecution to impeach that witness's testimony, since those statements were inconsistent. However, the trial court did not abuse its discretion when it found that the statements were not inconsistent. Freeman also argues that the jury's verdicts are against the manifest weight of the evidence. However, Freeman's arguments are meritless. An eyewitness testified that he saw Freeman possess and sell cocaine and the evidence introduced at trial corroborates that version of events. For these reasons, the trial court's decision is affirmed.
 Facts {¶ 3} On June 23, 2006, a confidential informant working for the police contacted Anton Banks and asked to purchase $500.00 worth of powdered cocaine from him. Banks contacted Freeman, who said that he had that much cocaine available for sale. Banks then arranged for the informant to pick him up and take him to the home where Freeman was staying. The informant gave Banks $500.00 of pre-recorded currency and Banks went to see Freeman and complete the purchase. In the house, Freeman pulled out a black lockbox containing powdered cocaine and scales, weighted out the appropriate amount of cocaine, and handed the cocaine to Banks. Banks gave Freeman $480.00 and kept $20.00 for himself.
 {¶ 4} Banks and the informant were stopped by police after the sale and Banks was arrested. Soon thereafter, the police obtained and executed a search warrant on the home where Freeman was staying. Freeman was not present at the time of the raid, but the people who were present told the police to look for the lockbox. When police found *Page 2 
the lockbox, they opened it and discovered powdered cocaine and scales.
 {¶ 5} Freeman found out the police were searching the residence as the police were conducting the raid. Soon thereafter, he was arrested in a parked car just over a block away from the home where he was staying. The police searched the car and discovered over $1,800.00 in cash in the trunk. Among that cash were $480.00 of the pre-recorded currency the informant gave to Banks. The other $20.00 of pre-recorded currency was found on Banks when he was arrested.
 {¶ 6} Forensic analysis of the contents of the lockbox showed that it contained powdered cocaine. Furthermore, forensic analysis showed that the substance sold to Banks was also powdered cocaine.
 {¶ 7} Freeman was indicted on July 12, 2006, for trafficking in and possession of drugs. The trafficking charge contained two specifications: 1) that it was committed within the vicinity of a school and 2) that the cash found in the trunk of Freeman's car were proceeds from the sale of drugs. The matter proceeded to trial on December 12, 2006, but the two specifications were not placed before the jury. The jury found Freeman guilty of both counts in the indictment. The trial court then sentenced Freeman to four years imprisonment on each count and ordered that those terms of imprisonment be served consecutively.
 Right to Confront Adverse Witnesses {¶ 8} In his first of two assignments of error, Freeman argues:
 {¶ 9} "Defendant-Appellant was denied the effective right of cross examination of certain prosecution witnesses; specifically cross examination as to inconsistent sworn statements for impeachment purposes contrary to Ohio Rules of Evidence 607, 608 and 613."
 {¶ 10} Although Freeman's assignment of error refers to "certain prosecution witnesses," his argument focuses only on one particular witness, Anton Banks, who was an eyewitness to the events. Freeman contends the trial court should have allowed him to play an audiotape of a conversation between Banks and Freeman which would show an alleged prior inconsistent statement. The State argues that Freeman's attempt to play *Page 3 
the tape was just a ploy to get his denial of committing the crime before the jury without subjecting him to cross-examination. It further contends that Banks' statements on the tape were not, in fact, inconsistent with his testimony at trial.
 {¶ 11} "[T]he Sixth Amendment to the United States Constitution and the Ohio Rules of Evidence guarantee the right of a criminal defendant to confront the witnesses against him for the biases they may hold."State v. McIntosh (2001), 145 Ohio App.3d 567, 578. However, a criminal defendant's right to confront and cross-examine a witness is not unlimited. Delaware v. Van Arsdall (1986), 475 U.S. 673, 679. A trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. Thus, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis sic.) Delaware v.Fensterer (1985), 474 U.S. 15, 20.
 {¶ 12} While cross-examination itself is a matter of right, the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court, which this court can only overturn for an abuse of discretion. State v. Green (1993),66 Ohio St.3d 141, 147, citing Alford v. United States (1931), 282 U.S. 687,691. The phrase "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157.
 {¶ 13} In this case, Freeman contends that the trial court denied him the opportunity to effectively cross-examine Banks because it did not allow Freeman to question Banks about his allegedly prior inconsistent statements and introduce those statements into evidence. Banks testified that Freeman sold him $500.00 worth of cocaine and that he gave this cocaine to the State's confidential informant. Freeman wanted to play the following tape of a telephone conversation between Banks and Freeman to impeach Banks: *Page 4 
 {¶ 14} "Mr. Banks: Water, sewage (inaudible) ever since that happened, that bullshit happened, it was bad. Everything was like 2, $300 apiece. Shit was going to get shut off. Bad.
 {¶ 15} "Mr. Freeman: All right. Well, I guess — I guess you must have did say that like you tell the truth to that girl because I got a thing back and my lawyer — from my lawyer and it said — it said that — that they don't got no tape, you know.
 {¶ 16} "Mr. Banks: Yeah.
 {¶ 17} "Mr. Freeman: So, you must — you must have said what's going on and tell the truth, huh?
 {¶ 18} "Mr. Banks: Yeah. Hey, I said, I thought I told you. I said I had my shit and I don't know the dude I got it from, whatever.
 {¶ 19} "Mr. Freeman: You told what — who — what dude you told them you got it from?
 {¶ 20} "Mr. Banks: No. They was — what was your source is what —
 {¶ 21} "Mr. Freeman: What was your source.
 {¶ 22} "Mr. Banks: And I said I don't even know the dude.
 {¶ 23} "Mr. Freeman: Oh, okay.
 {¶ 24} "Mr. Banks: That's what that was.
 {¶ 25} "Mr. Freeman: Yeah because I got that (inaudible) they said that they don't even got no — no tapes. So, I don't know what's going on.
 {¶ 26} "Mr. Banks: Yeah.
 {¶ 27} "Mr. Freeman: So, I'm looking to talk to my lawyer now. You heard from your lawyer?
 {¶ 28} "Mr. Banks: No. I ain't — I ain't talked to nobody. I got to call him Monday.
 {¶ 29} "Mr. Freeman: Oh, okay. They still talking about giving you 18 months?
 {¶ 30} "Mr. Banks: Yeah.
 {¶ 31} "Mr. Freeman: Oh, okay.
 {¶ 32} "Mr. Banks: (Inaudible) I guess (inaudible). *Page 5 
 {¶ 33} "Mr. Freeman: So — so, man, what — okay. Then yell me what if — what if the people, what if they ask you, what you — you know what I'm saying, you still going to tell them the truth? What you — what you say — what you going to tell them?
 {¶ 34} "Mr. Banks: Tell who?
 {¶ 35} "Mr. Freeman: The people that you said that — the girl — you told me that that girl — I asked you, you said, you know, what you said. Now what if the people ask you what, you know, the boys, if they ask you what you going to tell them?
 {¶ 36} "Mr. Banks: Well, everything was mine. That's all.
 {¶ 37} "Mr. Freeman: I'm saying what is you going to tell them though? I mean, I want to know. You got to let me know something.
 {¶ 38} "Mr. Banks: What you mean? I don't even know what you're talking about.
 {¶ 39} "Mr. Freeman: I'm saying if they — if they ask — if they ask you, you know what I'm saying, say they come, you know, without your lawyer and ask you, you know, and they want to get some type of deal with you.
 {¶ 40} "Mr. Banks: Oh, no, I'm good.
 {¶ 41} "Mr. Freeman: What you going to tell them, man? I want — what you going to say?
 {¶ 42} "Mr. Banks: The shit was mine. That's it. That's what I told them like from the start.
 {¶ 43} "Mr. Freeman: That's what you told them from the start?
 {¶ 44} "Mr. Banks: Yeah.
 {¶ 45} "Mr. Freeman: Oh, okay.
 {¶ 46} "Mr. Banks: I told them from the start that shit was mine and, like I said, I don't even know the dude's name, whatever. The shit's mine. (Inaudible).
 {¶ 47} "Mr. Freeman: All right. Okay. I'm cool with it. I'm cool with all that, you know what I mean because I'm cool with you as long as you just being truthful. I mean, you know what I'm saying (inaudible) but I don't got nothing to do with it, you know what I'm saying. *Page 6 
 {¶ 48} "Mr. Banks: Yeah.
 {¶ 49} "Mr. Freeman: If I'm wrong, I'm wrong but I ain't got nothing to do with it. So, that's that. So, I'm — I'm — you know what I'm, saying, I'm — what I'm going to do is just, you know, go ahead and — hey, I'm going to call you back. All right?
 {¶ 50} "Mr. Banks: All right."
 {¶ 51} According to Freeman, he and Banks were talking about the drug transaction which formed the basis of the present charges in this conversation. Therefore, Banks' statements that the "shit," i.e. drugs, were his and that he did not know from whom he bought them would be inconsistent with his testimony at trial that he purchased them from Freeman. The State disagrees, arguing that Banks' statements to Freeman was only a statement of what he was going to say happened, while his trial testimony was a description of what actually happened.
 {¶ 52} An out-of-court statement by a declarant is generally inadmissible hearsay if it is offered for the truth of the matter asserted. Evid. R. 801(C); Evid. R. 802. However, Evid. R. 607(A) allows a party to attack a witness's credibility through the use of prior inconsistent statements as long as those statements are used solely for the purposes of impeachment.
 {¶ 53} The Rules of Evidence do not define when a statement is inconsistent. However, "[a] general definition of an inconsistent statement is: `It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.'" State v. Berry (June 29, 1999), 10th Dist. Nos. 97AP-964, 98AP-256, quoting McCormick, Evidence (3rd Ed. Cleary Ed. 1984) 73, Section 34, n. 15. Ohio's courts should be liberal when determining whether two statements are inconsistent. State v.Kline (1983), 11 Ohio App.3d 208, 212. A trial court has the discretion to determine whether two statements are inconsistent and whether any differences between prior statements and trial testimony are material inconsistencies. State v. Reyes, 6th Dist. No. WD-02-069,2004-Ohio-2217, at ¶ 45.
 {¶ 54} A trial court does not abuse its discretion when it refuses to allow a *Page 7 
defendant to cross-examine a police officer on the differences between "a short time" and "four seconds" in a motion to suppress a field sobriety test. State v. Frisby, 12th Dist. No. CA2001-05-102, 2002-Ohio-0616, at 2. Similarly, a trial court did not abuse its discretion when it found no material inconsistencies in the victim's testimony in State v. Slocum, 6th Dist. No. WD-04-054, 2005-Ohio-3869. In that case, the witness testified at trial that the defendant brought up the subject of being with a younger woman "a couple of days" into the defendant's stay at her residence that he had raised the topic a few times prior to a particular date. Id. at ¶ 24. The victim had previously testified that the defendant had been at her house about a week before raising that issue and that they first discussed it on that particular date. Id.
 {¶ 55} State v. McMillan (1990), 69 Ohio App.3d 36 provides a contrast, showing that trial courts can abuse their discretion when finding that two statements are inconsistent. In that case, the defendant testified that he had never molested or raped anybody. The trial court allowed the State to impeach that statement by using a prior statement that the defendant had made to the police, where in he admitted that he had sexual intercourse with his sister when they were teenagers. The appellate court found that the trial court abused its discretion when it concluded that these statements were inconsistent. Id. at 46.
 {¶ 56} In this case, the trial court determined that the differences between Banks' prior statements and his testimony were not material inconsistencies. According to the trial court, the testimony given at trial was a description of how Banks obtained the cocaine, while the statements on the phone were merely relating the tale that Banks was going to tell the police. Since one statement was a statement of what happened and the other was a statement of what Banks was going to say happened, the two did not address the same subject and, therefore, were not inconsistent.
 {¶ 57} Berry is a case with a fact-pattern which is somewhat similar to the one in this case. In Berry, a witness testified on direct examination that he made a statement to a detective and that no deal had been made in exchange for that statement. On cross-examination, the witness testified that he told the detective that the prosecutor was not *Page 8 
trying to make a deal with him in exchange for his testimony. Defense counsel sought to impeach these statements with a portion of a taped interview between the witness and the detective, where the detective asked the witness if the witness's mother called the prosecutor to try to get him to work a deal for the witness in exchange for the witness testifying against the defendant.
 {¶ 58} The trial court concluded that these statements were not inconsistent and the appellate court concluded that the trial court did not abuse its discretion when reaching this decision. "[The witness]'s testimony concerns whether any deals were made with him in exchange for his testimony or whether he was involved in any discussions about deals in exchange for his testimony. The statement on the tape that appellant sought to use for impeachment concerns whether Wright's mother was involved in any discussions with the government to arrange a deal for Wright in exchange for his testimony." Id. at 8.
 {¶ 59} Given the Tenth District's decision in Berry, we cannot conclude that the trial court acted unreasonably when it concluded that the statements were not inconsistent. Thus, the trial court's decision to disallow Freeman from presenting this evidence was not an abuse of discretion. Accordingly, Freeman's first assignment of error is meritless.
 Manifest Weight of the Evidence {¶ 60} In his second assignment of error, Freeman argues:
 {¶ 61} "The Defendant-Appellant's conviction was against the manifest weight of the evidence."
 {¶ 62} When reviewing whether a conviction was against the manifest weight of the evidence, this court must "examine whether the evidence produced at trial `attains the high degree of probative force and certainty required of a criminal conviction.'" State v. Tibbetts,92 Ohio St.3d 146, 163, 2001-Ohio-0132, quoting State v. Getsy,84 Ohio St.3d 180, 193, 1998-Ohio-0533. In order to do this, this court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. *Page 9 
"`Weight is not a question of mathematics, but depends on its effect ininducing belief" (Emphasis sic.) State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-0052, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 63} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983)20 Ohio App.3d 172, 175. "To reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id. at paragraph four of the syllabus.
 {¶ 64} Freeman was convicted of the following two offenses: 1) trafficking in drugs in violation of R.C. 2925.03(A)(1), a third degree felony under R.C. 2925.03(C)(4)(d), and 2) possession of drugs in violation of R.C. 2925.11(A), a third degree felony under R.C. 2925.11(C)(4)(c). R.C. 2925.03(A)(1) makes it illegal for a person to "knowingly * * * [s]ell or offer to sell a controlled substance," while R.C. 2925.11(A) makes it illegal to "knowingly obtain, possess, or use a controlled substance." A "controlled substance" is "a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V." R.C. 2925.01(A); R.C. 3719.01(C). Cocaine is a Schedule II substance. R.C. 3719.41 Schedule II(A)(2).
 {¶ 65} The culpable mental state for each of these offenses is "knowingly." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Furthermore, possession of drugs may be actual or constructive. State v. Scalf (1998), 126 Ohio App.3d 614, 619, citingState v. Haynes (1971), 25 Ohio St.2d 264; State v. Hankerson (1982),70 Ohio St.2d 87, syllabus.
 {¶ 66} In this case, the evidence strongly supports Freeman's convictions. Banks testified that he received a phone call from a woman named Nancy who wanted to purchase $500.00 worth of powder cocaine from Banks. Banks called Freeman's cell phone from his own cell phone and confirmed that Freeman had that much cocaine. *Page 10 
Banks then arranged to have Nancy pick him up and take him to Freeman's sister's home, where Freeman was staying.
 {¶ 67} Banks got into Nancy's vehicle at the arranged time and she drove him to the house. Banks went into the house and visited for a few minutes until two other people in the house left. Banks then gave Freeman $480.00 and kept $20.00 for himself. Freeman then pulled a lockbox out from near a couch, retrieved a scale and a bag of powdered cocaine from the box, weighed out the requested amount of cocaine, and gave that amount to Banks. Banks then went back outside to Nancy's car. Shortly afterward, Nancy's car was stopped by police and Banks was arrested. At that time, Banks did not tell police the name of the person from whom he had purchased the drugs. He later agreed to cooperate with police in a plea agreement. In the meantime, Freeman arranged to pay Banks' bail after his initial arrest.
 {¶ 68} When the police arrested Banks, they seized his cell phone, which confirmed both the calls from Nancy and the calls to Freeman. Banks also testified that Freeman drove a green Alero.
 {¶ 69} Freeman's sister, Sonya, testified that Freeman was staying at her home that weekend. She testified that the police executed a search warrant in the house and found the lockbox, which she testified was originally hers, but that she had not used it recently. Sonya also testified that she had known Freeman to use that lockbox. Finally, Sonya confirmed that Freeman drove a green Alero.
 {¶ 70} Talia King, Sonya's daughter, lived with her mother and confirmed that Freeman would visit them on weekends. She also confirmed that her mother had owned a lockbox. She did not confirm that Freeman used the lockbox. Another relative, Jordan Montgomery, testified that he told the police that he had never seen the lockbox before, even though he had been living at Sonya's house for two months before the warrant was executed.
 {¶ 71} The other State's witnesses were all either police officers or forensic technicians. Some officers helped secure the residence while the search warrant was being executed. While doing so, Freeman walked up to some of these officers to see *Page 11 
what was going on. After finding out that the police were executing a warrant, Freeman drove away in a green Alero. After officers were notified to keep a lookout for Freeman and his vehicle, the car was located a few blocks away from the house. Officers found a large amount of cash, $1,872.00, in the trunk of Freeman's green Alero.
 {¶ 72} Officers also testified that Sonya told them that the police should check a black box in the house. They told the detectives about this, who then spoke to Sonya. The officers found the lockbox next to the couch where Freeman was sitting when he made the transaction with Banks.
 {¶ 73} The detective in charge of this investigation testified that he supplied Nancy with $500.00 of pre-recorded currency so she could effect a drug purchase. The detective had photocopied the currency so he could track those bills after the purchase. He then followed Nancy after she picked up Banks, waited in a parked car across the street as Banks went into the house to purchase the drugs, and stopped Nancy's vehicle after Banks effected the purchase. He then obtained and executed a warrant to search the Freeman home.
 {¶ 74} While executing the warrant, the detective talked to Sonya, who told him the drugs would be in the black box. After hearing this, the detective found the lockbox and forced it open. Inside the box, he found scales and a bag of powdered cocaine. The detective also found Freeman's cell phone near the couch and lockbox, which confirmed the phone calls from Banks. The detective stated that $480.00 of the pre-recorded currency given to Nancy was in the trunk of the green Alero found with Freeman. The other $20.00 was on Banks when he was arrested.
 {¶ 75} Forensic technicians were unable to match any fingerprints from the lockbox to Freeman. However, they testified that this was not unusual, since fingerprints are fragile and not always left behind easily. Technicians also confirmed that the substance at issue in the case was powdered cocaine.
 {¶ 76} Finally, Freeman had one witness testify on his behalf. Shawn Fletcher testified that he knew both Banks and Freeman. His testimony was designed to impeach Banks by stating that he and Banks would use controlled substances while in school. *Page 12 
 {¶ 77} This evidence clearly supports Freeman's convictions for trafficking and possession of drugs. Banks' testimony establishes both that Freeman possessed and sold the drugs. The fact that Freeman was found in a car with the money given to Nancy by the detective corroborates Banks' version of events. Finally, the contents of the lockbox corroborate Banks' version of events. The jury did not lose its way when finding Freeman guilty. His second assignment of error is meritless.
 Conclusion {¶ 78} In conclusion, Freeman argues that the trial court abused its discretion when it limited his cross-examination of Banks. However, the trial court did not err since it only prevented Freeman from using a statement by Banks which was not inconsistent with Banks' testimony to impeach Banks. Furthermore, the manifest weight of the evidence supports Freeman's convictions. Accordingly, the judgment of the trial court is affirmed.
Vukovich, J., concurs.
 Waite, J., concurs. *Page 1